J-S04023-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RONALD THOMAS | : | |
| | : | |
| Appellant | : | No. 1034 EDA 2022 |

Appeal from the Order Entered March 4, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013001-2010

BEFORE: MURRAY, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:              **FILED SEPTEMBER 11, 2023**

Appellant, Ronald Thomas, appeals from the order entered in the Philadelphia County Court of Common Pleas, denying his motion to bar retrial under principles of double jeopardy. We affirm.

This Court has previously set forth the underlying relevant facts and procedural history of this case as follows:

> The charges against [Appellant] relate to his shooting and murder of Anwar Ashmore (Ashmore).
>
> Ashmore was fatally shot in the chest at the corner of North Stanley and West [Huntingdon] Streets in Philadelphia at approximately 9:00 P.M. on the evening of April 22, 2010. He suffered injuries to his sternum, heart, ribs, lungs and left arm. When Philadelphia Police Officers William Forbes and Anthony Ricci arrived on the scene moments later, a group of people was standing around him as he gasped for air. Ashmore was unable to answer the officers' questions

_____

[*] Retired Senior Judge assigned to the Superior Court.

and the bystanders denied having heard anything. Ashmore was pronounced dead at Temple University Hospital moments after arriving. The cause of death was two gunshot wounds to the chest, later determined to be from a .45 caliber handgun.

Approximately one hour after the shooting, Detectives Philip Nordo, Tracy Byard, Thorsten Lucke and Billy Golphin arrived at the scene. The police did not locate any eyewitnesses to the murder that night. However, one month later, on May 22, 2010, they arrested Raphael Spearman three blocks from the murder scene after a police chase. He was in possession of a .45 caliber handgun that was later determined to be the gun that fired the bullets that killed Ashmore. Over the ensuing days and months, Troy Devlin, Jeffrey Jones, Raphael Spearman and Kaheem Brown identified [Appellant] as Ashmore's killer. Detective Nordo took the statements of Devlin, Jones and Spearman. Detective [Nathan] Williams took Brown's statement.

\*   \*   \*

Trial commenced on September 11, 2018.[1] The Commonwealth proceeded under the theory that [Appellant] murdered Ashmore in retaliation for the shooting of his associate…approximately five months earlier. At trial, the Commonwealth presented Devlin, Jones, Spearman and Brown, each of whom identified [Appellant] as the shooter in their police statements, but then recanted at trial.[2] …

_____

[1] This was Appellant's second trial, as this Court had granted Appellant a new trial based on the admission of hearsay evidence at his first trial in 2013. **See Commonwealth v. Thomas**, No. 1121 EDA 2013 (Pa.Super. 2015) (unpublished memorandum) ("**Thomas I**"), *appeal denied*, 635 Pa. 743, 134 A.3d 56 (2016).

[2] In recanting his testimony, Devlin claimed that he did not remember anything about the murder or giving a statement to police. Jones claimed his earlier statement to police implicating Appellant had been coerced by the homicide detectives. Spearman was found unavailable to testify after he refused to leave his cell, walk to the witness stand, or acknowledge his name

*(Footnote Continued Next Page)*

- 2 -

\*    \*    \*

On September 19, 2018, at the conclusion of trial, the jury convicted [Appellant] of first-degree murder and related charges.  The court sentenced him to an aggregate term of life imprisonment.  [Appellant] timely appealed.  …

\*    \*    \*

[Prior to trial, o]n September 5, 2018, the Commonwealth [had] filed a Motion *in Limine* to Preclude Reference to Detective Nordo's Alleged Misconduct on the basis that such evidence was hearsay, irrelevant and collateral.  More specifically, the Commonwealth maintained that, although the detective had since been fired by the Philadelphia Police Department for his misconduct, his actions occurred approximately five years after his interrogations in this case, none of the allegations involved [Appellant's] case, no criminal charges had been filed, and the Commonwealth did not intend to call him as a witness.  Therefore, the Commonwealth argued, Detective Nordo's misconduct was a collateral issue.  The court granted the motion the same day.

Neither Detective Nordo nor Detective Williams testified at trial.  At the time of trial, Detective Nordo had been dismissed from the Philadelphia Police Department for allegedly putting money in prison inmates' commissary accounts and improperly communicating with witnesses and defendants outside of his official duties.  There was no

---

on the record.  Nevertheless, the Commonwealth introduced Spearman's testimony from Appellant's first trial in 2013, during which Spearman had also recanted his police statement implicating Appellant and stated that the detectives had coerced his testimony.  Brown testified at Appellant's 2018 trial that he did not know or remember anything about the murder.  Brown was also confronted with his 2013 testimony, in which Brown had claimed that the detectives tortured him into signing a statement implicating Appellant.  At the 2018 trial, Brown maintained that he could not remember giving the 2013 testimony or remember the detectives torturing him.  ***See Commonwealth v. Thomas***, No. 2898 EDA 2018, unpublished memorandum at 4-12 (Pa.Super. filed June 3, 2020) ("***Thomas II***").

evidence of misconduct by Detective Williams at that time.

Since [Appellant's] trial, the Commonwealth has filed criminal charges against Detectives Nordo and Williams premised on their alleged misconduct in the investigation of crimes and use of police resources and has vacated the judgment of sentence and conviction in other cases based on Detective Nordo's misconduct. It has provided [Appellant] with related discovery. On April 22, 2019, [Appellant] filed a motion for remand to allow the trial court to conduct an evidentiary hearing based on this newly provided evidence. This Court denied the motion *per curiam*, without prejudice to [Appellant] bringing the issue up [before the] merits panel.

\*     \*     \*

Since the conclusion of his trial, the Commonwealth has provided [Appellant] with information about Detective Nordo's role in an unrelated murder case, ***Commonwealth v. Powell***, No. CP-51-CR-0006915-2015. In ***Powell***, the trial court dismissed all charges after "new and uniquely troubling information" about Detective Nordo's investigative techniques were revealed at a pretrial hearing on Powell's motion to dismiss.

At the hearing, the evidence showed that Detective Nordo made phone calls and unauthorized visits to incarcerated witnesses and deposited money into their prison accounts. He also had unauthorized contact with a judge without the District Attorney's knowledge and sought pretrial release of an incarcerated witness. He lied about whether he had prior relationships with witnesses he claimed only to have met during his investigation of Powell and his co-defendant. One of the witnesses could be heard on recorded prison phone calls telling Detective Nordo that he loves him and calling him "Coach." Nordo was unavailable for Powell's pretrial hearing because Nordo's attorney stated that Nordo would assert his Fifth Amendment privilege against self-incrimination.

Further, Detective Nordo took a statement from a person who was under the influence of illegal narcotics and suggested everything that ultimately was said in the

- 4 -

statement. That statement alluded to another conversation between the individual and the detectives that was not recorded. The detective had kept Powell's co-defendant in custody for seventeen hours before taking his written statement.

The Commonwealth also disclosed to [Appellant] a grand jury report that detailed Detective Nordo's coercive interrogation techniques, including threatening individuals with prosecution, intimidating individuals into signing false statements and giving people cash rewards for providing fabricated statements. The disclosure included multiple indictments that charged Detective Nordo with coercive sex crimes related to his interrogation of suspects and witnesses.

\* \* \*

Detective Nathan Williams was arrested in November 2019 and charged with tampering with public records, unsworn falsification to authorities, tampering with or fabricating physical evidence, and obstructing the administration of law. Since that time, the Commonwealth provided [Appellant] with certain related disclosures pursuant to its practice. Those disclosures included information from an internal investigation report showing that Detective Williams used police database records to find personal information about a woman that his cousin had been harassing and send the woman's personal information to his cousin, and then lying, attempting to conceal his misconduct from internal investigators.

**Thomas II** at 3-16 (internal citations and footnotes omitted). On direct appeal from his 2018 judgment of sentence, this Court remanded for an evidentiary hearing concerning the newly-discovered evidence of the misconduct of Detectives Nordo and Williams, and to determine whether the

Commonwealth committed a **Brady**[3] violation by failing to disclose this information to defense counsel prior to trial. **See id.** at 24-25.

Upon remand, the parties agreed not to conduct an evidentiary hearing and to grant Appellant a new trial based on the Commonwealth's "negligent" **Brady** violation in suppressing certain 2005 allegations against Detective Nordo. (**See** Commonwealth's Answer Regarding Nordo's Misconduct and its Nexus to this Case, 5/20/21, at ¶32).[4] Thus, on May 25, 2021, based on the Commonwealth's agreement, the assigned homicide calendar jurist, Judge Ransom, awarded Appellant a new trial.

Thereafter, the case was reassigned to Judge DeFino-Nastasi for a new trial. On July 8, 2021, Appellant filed a motion to bar retrial on double jeopardy grounds based on the Commonwealth's intentional or reckless failure to disclose Detective Nordo's misconduct to defense counsel prior to

_____

[3] **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding suppression by prosecution of evidence favorable to accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of prosecution).

[4] Specifically, the Commonwealth conceded: "Although the Commonwealth had actual knowledge of some of Nordo's prior acts of misconduct (and constructive knowledge of other prior acts of misconduct…) at the time [Appellant] was put on trial in this case in 2013 as well as in 2018, the trial prosecutors negligently suppressed that **Brady** information from the defense." (**See id.**) The 2005 allegations against Detective Nordo which the Commonwealth admitted that it had failed to disclose, involved a sexual incident in an interrogation room where a witness's sperm was discovered in the interrogation room. The Commonwealth did not prosecute Detective Nordo based on any misconduct arising from this incident at that time.

Appellant's 2018 trial. The court held hearings on the motion on February 15, 2022 and March 4, 2022.

At the February 15, 2022 hearing, Deputy District Attorney Matthew Krouse of the Delaware County District Attorney's Office testified that he was previously employed as an Assistant District Attorney at the Philadelphia District Attorney's Office. Attorney Krouse prosecuted Appellant's second trial in 2018. Attorney Krouse said that Detective Nordo was involved in the investigation of Appellant's case but was not called as a witness, and Attorney Krouse had no interaction with him pertaining to Appellant's case. Attorney Krouse testified that in June 2018 (prior to Appellant's trial), Attorney Krouse's supervisor, then-Assistant Chief Ed Cameron,[5] sent an email to Attorney Krouse indicating that charges had been dismissed against a defendant in the *Powell* case based on allegations of Detective Nordo's misconduct. Attorney Krouse discussed an email chain regarding Detective Nordo, which Attorney Krouse confirmed was the extent of his knowledge regarding Detective Nordo's misconduct. Attorney Krouse said he knew there was an indication that Detective Nordo put money on people's books and promised to help people with backtime in the *Powell* case. In light of this knowledge, Attorney Krouse maintained that he wanted to ensure he did everything possible to pass the necessary information to Appellant's counsel and let the defense be aware

_____

[5] Attorney Cameron died several months before the hearing.

that Detective Nordo was under investigation.

Attorney Krouse acknowledged that some witnesses who had given police statements implicating Appellant had recanted their testimony in Appellant's initial 2013 trial, but Attorney Krouse believed those witnesses did so for the typical reasons that witnesses recant, such as not wanting to be a "snitch," and no witness had made an allegation against Detective Nordo that mirrored the allegations from the *Powell* case. After discussions with his supervisors, Attorney Krouse filed the motion *in limine* in Appellant's case to preclude reference to the open investigation of Detective Nordo, as Attorney Krouse believed it was collateral in nature. Attorney Krouse also confirmed that, as far as he knew, there was no indication of any credible allegations against Detective Nordo as they pertained to witnesses involved in Appellant's case.

Attorney Krouse testified that he did not learn about other allegations against Detective Nordo (beyond those in *Powell*) until December 2018, after Appellant's 2018 trial. At that time, the Conviction Integrity Unit ("CIU") reached out to Attorney Krouse about Detective Nordo. Attorney Krouse reiterated that in September 2018, he did not have any knowledge about any misconduct by Detective Nordo other than what was disclosed in the June 2018 emails regarding the *Powell* case. Further, at the time of Appellant's September 2018 trial, there had been no unit-wide meetings concerning Detective Nordo or policies in place regarding Detective Nordo. In December

2018 or early 2019, Attorney Krouse was instructed to go over his cases and let his supervisors know if Detective Nordo had been involved in a case.

On cross-examination,[6] Attorney Krouse discussed an August 2018 email, in which he asked his supervisors if he had to pass any information to the defense in Appellant's case concerning the allegations about Detective Nordo. Attorney Krouse's supervisors advised him that if Attorney Krouse was not planning to call Detective Nordo as a witness, then Attorney Krouse did not need to pass the information to the defense, unless so requested. At that time, Attorney Krouse understood that Detective Nordo was placed on a "do not call" witness list. Attorney Krouse confirmed that he did not believe that the allegations against Detective Nordo in the *Powell* case were material to Appellant's case. Because Attorney Krouse was not calling Detective Nordo as a witness, Attorney Krouse did not believe he had an obligation to disclose any information to defense counsel about allegations against Detective Nordo. Attorney Krouse also stated that the transcript from *Powell* was publicly available in June 2018, which detailed the extent of Detective Nordo's misconduct in *Powell*, but Attorney Krouse had not read the transcript. Attorney Krouse made clear that there was no intention to hide anything from

---

[6] We note that although it was Appellant's burden at this hearing, the Commonwealth initially called Attorney Krouse, so Appellant's attorney conducted cross-examination. Following Attorney Krouse's testimony, Appellant called the remaining witnesses, and the Commonwealth conducted cross-examination of those witnesses.

the defense regarding Detective Nordo. (**See** N.T. Hearing, 2/15/22, at 13-94).

Assistant District Attorney Sarah Boyette testified next. Attorney Boyette testified that she works in the Philadelphia District Attorney's Office in the CIU. Following this Court's 2020 remand decision, Attorney Boyette's assignment was to review Appellant's case in light of Detective Nordo's misconduct and to ascertain what the CIU's position would be on this case. As part of her investigation, Attorney Boyette reviewed the transcripts of Appellant's 2013 trial and 2018 retrial. She also reviewed appellate filings and opinions regarding both trials. Attorney Boyette further reviewed the Philadelphia Police Department's homicide file, and she conducted additional research about the underlying relationships and facts of this case. Attorney Boyette confirmed that two of the witnesses who recanted their police statements implicating Appellant, had alleged misconduct involving Detective Nordo. Following her review of the file, Attorney Boyette concluded that there had been a **Brady** violation in this case, and relief was due on those grounds. Attorney Boyette stated that her supervisors, Patricia Cummings and Mike Garmisa, agreed with her conclusion. Attorney Boyette elaborated on her conclusion, stating that she believed the trial prosecutor had negligently suppressed **Brady** information from the defense because the Commonwealth had a duty to disclose it and breached that duty; therefore, the breach was inherently negligent, and Appellant was entitled to a new trial.

Upon cross-examination, Attorney Boyette confirmed that she did not find any evidence that would have allowed her to take a position as to any questions of intent or recklessness. Upon questioning from the court, Attorney Boyette elaborated that the ***Brady*** violation in this case was the Commonwealth's failure to inform defense counsel of both the substantive scope of Detective Nordo's misconduct and the extensive time frame. Specifically, Attorney Boyette testified that the District Attorney's Office knew of Detective Nordo's misconduct as of May 2005, based on a complaint by a person in an interrogation room as to some kind of sexual misconduct by Detective Nordo. In other words, Attorney Boyette believed the Commonwealth had committed a ***Brady*** violation when it represented to the defense prior to Appellant's 2018 trial that the scope of Detective Nordo's misconduct was limited to making promises to assist with probation backtime, putting money on books, and making improper jail calls (as discussed in ***Powell***).

Because there were other incidents of misconduct against Detective Nordo at that time, including the 2005 sexual complaint incident, Attorney Boyette testified that Attorney Krouse did not disclose all pertinent information about Detective Nordo to defense counsel. Attorney Boyette also referenced other allegations against Detective Nordo about coercing witness statements, but Attorney Boyette admitted she was not privy to the details of those allegations and could not provide anything specific as it pertained to those

allegations. Aside from the 2005 incident and the allegations involved in the **Powell** case, Attorney Boyette confirmed that she could not give a date or time of any other information regarding misconduct by Detective Nordo. (**See id.** at 96-128).

Assistant District Attorney Michael Garmisa testified that he is the supervisor in the CIU. Attorney Garmisa discussed a Police Misconduct Disclosure database ("PMD") that contains any claims related to Detective Nordo's involvement in a case (also known as the "Nordo packet"). Attorney Garmisa stated that the PMD has gotten bigger over time. At the time of Appellant's second trial in 2018, the PMD would have contained the allegations against Detective Nordo at issue in the **Powell** case. Attorney Garmisa stated that there were no other cases at that time involving Detective Nordo's alleged misconduct. Nevertheless, Attorney Garmisa recalled that the Special Investigations Unit had made requests from the homicide unit for any cases that Detective Nordo had worked on due to the active grand jury investigation.

Attorney Garmisa also discussed that as of December 17, 2018 (after Appellant's 2018 trial), the PMD contained information related to the case of **Commonwealth v. Camp**, CP-51-CR-0007886-2015, in which charges had been dismissed against a defendant on April 11, 2017. In that case, Detective Nordo was a witness who had supposedly discovered a weapon and claimed it was the defendant's weapon. Ultimately, the Commonwealth dropped the charges in **Camp** based on the ongoing grand jury investigation into Detective

Nordo. However, the information pertaining to the grand jury investigation was protected by grand jury secrecy. Attorney Garmisa confirmed that there was not a "Nordo team" in place at the time of Appellant's second trial in September 2018. As additional allegations unfolded against Detective Nordo, there were more formal policies in place concerning how to handle cases where Detective Nordo had been involved. As of December 2018, the policy was not to call any witness in a case who may have been tainted by Detective Nordo. Attorney Garmisa made clear that he had no conversations with Attorney Krouse regarding calling Nordo-related witnesses in September 2018; the first contact Attorney Garmisa had about any cases involving Detective Nordo was in December 2018 concerning another matter unrelated to Appellant's case. (*Id.* at 129-191). Following Attorney Garmisa's testimony, the proceedings were adjourned.

On March 4, 2022, the hearing continued. Attorney Anthony Voci, Jr. testified that he was the chief of the homicide unit in 2018. In 2017, Attorney Voci was aware that Detective Nordo was under investigation for a series of incidents that were deemed unlawful and inappropriate. Attorney Voci stated that he was essentially "screened off" from anything related to Detective Nordo, and anything related to Detective Nordo would be handled by the CIU, which would then decide whether the homicide unit would proceed on cases where Detective Nordo was a witness. Attorney Voci confirmed that Attorney Krouse had consulted with the CIU regarding how to proceed in Appellant's

case, and the CIU gave Attorney Krouse permission to go forward with trial. Attorney Voci discussed a December 6, 2018 email he drafted, which instructed his colleagues to review their files carefully to see if Detective Nordo was assigned or involved in any cases. If Detective Nordo's name came up anywhere, attorneys were to notify Attorney Voci immediately. Attorney Voci sent the email to ensure that he could notify the CIU about their existence. Thereafter, the CIU would provide guidance on how to proceed.

Attorney Voci discussed an email from August 2018, in which Attorney Krouse had asked then-Assistant Chief Ed Cameron about whether Attorney Krouse had to pass information about Detective Nordo to defense counsel in Appellant's case. Attorney Cameron responded that Attorney Krouse should not call Detective Nordo as a witness, and Attorney Cameron believed that the Commonwealth did not have to turn anything over related to Detective Nordo if he was not going to be called as a witness. Attorney Voci, who was also on the email thread, agreed with Attorney Cameron's suggestion, but said he would double check with Patricia Cummings in the CIU. Attorney Voci said that regardless of his personal opinion, the CIU would make the final decisions regarding how to handle any cases involving Detective Nordo.

Upon cross-examination, Attorney Voci testified that Patricia Cummings was the head of the CIU at the time, and she determined whether a case could proceed based on Detective Nordo's amount of involvement and other evidence in the case. Attorney Voci also clarified that the reason he was

"screened off" from cases involving Detective Nordo was because a stack of Attorney Voci's business cards had been found in Detective Nordo's vehicle. Attorney Voci had no idea why his business cards would be in Detective Nordo's vehicle because Attorney Voci had not seen Detective Nordo in 15 years. (*See* N.T. Hearing, 3/4/22, at 13-40). Following Attorney Voci's testimony, the defense rested its case and the parties proceeded to argument.

At the conclusion of the March 4, 2022 hearing, the court denied Appellant's motion to bar retrial. Specifically, the court decided that the Commonwealth's actions did not violate **Brady** in this case where the relevant information concerning Detective Nordo's misconduct was in the public domain at the time of Appellant's September 2018 trial. Regarding the 2005 incident that the Commonwealth did not disclose to trial counsel, the court decided such action was not a **Brady** violation (notwithstanding Attorney Boyette's position that it was) because the 2005 incident involving Detective Nordo would not be material evidence that would affect the outcome of Appellant's trial. Regarding the grand jury proceedings pertaining to Detective Nordo, the court explained that such information was secret and could not be shared outside the grand jury room.[7] Even if the Commonwealth violated **Brady**,

_____

[7] The court explained that Detective Nordo was indicated in 2019, after Appellant's second trial. The court said that it was not until the indictment that Detective Nordo's coercive interrogation techniques actually came to light, including threatening individuals with prosecution, intimidating
*(Footnote Continued Next Page)*

however, the court ruled that its conduct was not intentional and/or reckless as required to bar a retrial under double jeopardy principles. Nevertheless, the court determined that the information regarding Detective Nordo constituted after-discovered evidence, which entitled Appellant to a new trial.[8] (***See id.*** at 60-79).

Appellant filed a notice of appeal on Monday, April 4, 2022.[9] On June 2, 2022, Appellant filed a voluntary concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises three issues for our review:

> Where the Commonwealth conceded, and the [trial] court granted, a motion for a new trial based on a violation of [***Brady***], did the doctrine of collateral estoppel and the coordinate jurisdiction rule bar a second judge from reopening that decision months later when [A]ppellant sought to bar retrial on double jeopardy grounds?
>
> Should the motion to dismiss have been granted where there was both intentional and reckless suppression of evidence by the Commonwealth as the [c]ourt seemed to find?
>
> Assuming that the [trial c]ourt could reopen this matter, were there insufficient factual and legal bases for finding

_____

witnesses into signing false statements, giving individuals cash rewards for providing fabricated statements, and various sex crimes.

[8] Although there were some references to Detective Williams during the hearings, Appellant did not develop any argument concerning Detective Williams' alleged misconduct in any meaningful way at the hearings or on appeal. Therefore, we do not discuss any misconduct by Detective Williams in this decision.

[9] We discuss the propriety of the appeal ***infra***.

that no **Brady** violation had occurred?

(Appellant's Brief at 2).

As a preliminary matter, we note that a trial court must make a determination of frivolousness following the denial of a motion to dismiss on double jeopardy grounds. **See** Pa.R.Crim.P. 587(b)(3) and (4) (explaining that following hearing on motion to dismiss based on double jeopardy violation, trial court shall enter on record statement of findings of fact and conclusions of law, and in case where judge denies motion, findings of fact shall include specific findings as to frivolousness). If the court decides the motion was frivolous, the trial court must advise the appellant that he has the right to file a petition for review of that order within 30 days. **See** Pa.R.Crim.P. 587(b)(5). If the court decides the motion was not frivolous, the court must advise the appellant that the order is immediately appealable as a collateral order. **See** Pa.R.Crim.P. 587(b)(6).

In **Commonwealth v. Gross**, 232 A.3d 819 (Pa.Super. 2020) (*en banc*), *appeal denied*, 663 Pa. 352, 242 A.3d 307 (2020), this Court addressed an appeal from an order dismissing appellant's double jeopardy motion on the merits, even though the trial court did not make any findings regarding frivolousness. **See id.** (explaining that order denying double jeopardy motion that makes no finding that motion is frivolous is collateral order under Pa.R.A.P. 313; noting that whether trial court followed or deviated from Rule 587 does not deprive this Court of appellate jurisdiction; our jurisdiction is

conferred under Rule 313 of appellate rules and enduring precedent). ***See also Commonwealth v. Ramos***, No. 1552 EDA 2021 (Pa.Super. filed Dec. 13, 2022) (unpublished memorandum)[10] (relying on ***Gross*** and holding that order denying appellant's motion to dismiss on double jeopardy grounds was immediately appealable as collateral order even though trial court did not make specific finding as to frivolousness).

Here, the trial court's March 4, 2022 order denying relief did not state whether Appellant's motion was frivolous, nor did the court issue any findings of fact on this issue. Nevertheless, we deem the order appealable as a collateral order and proceed to a merits review. ***See Gross, supra***; ***Ramos, supra***.

As a second preliminary matter, we note the general rule that "to preserve their claims for appellate review, appellants must comply whenever the [trial] court orders them to file a Statement of Matters Complained of on Appeal pursuant to [Rule] 1925. Any issues not raised in a [Rule] 1925(b) statement will be deemed waived." ***Commonwealth v. Castillo***, 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) (quoting ***Commonwealth v. Lord***, 553 Pa. 415, 420, 719 A.2d 306, 309 (1998)). Where the court does not order an appellant to file a Rule 1925(b) statement, and an appellant files one on his own accord, he is limited on appeal to raising only those issues he presented

---

[10] ***See*** Pa.R.A.P. 126(b) (stating non-precedential decisions of Superior Court filed after May 1, 2019 may be cited for persuasive value).

- 18 -

in his voluntary Rule 1925(b) statement. *See Commonwealth v. Nobles*, 941 A.2d 50 (Pa.Super. 2008); *Commonwealth v. Snyder*, 870 A.2d 336 (Pa.Super. 2005).

Here, Appellant voluntarily filed a Rule 1925(b) statement on June 2, 2022. In his concise statement, Appellant raised the following single issue: "Did the [c]ourt commit error when the [c]ourt denied the Motion for Double Jeopardy after [granting] a new trial, based on the Commonwealth's intentional and/or reckless *Brady* violations which violated his right to a fair trial?" (Rule 1925(b) Statement, filed 6/2/22, at 1). Significantly, Appellant did not raise in his concise statement his first issue on appeal concerning whether the trial court violated the coordinate jurisdiction rule or the doctrine of collateral estoppel; or his third issue concerning whether there were "insufficient factual or legal bases" for the court to find that no underlying *Brady* violation occurred. Rather, the sole issue Appellant preserved in his concise statement was his second issue raised on appeal, namely, whether the court erred in denying the motion to dismiss based on the Commonwealth's intentional and/or reckless conduct. Thus, Appellant's first and third issues are waived, and we limit our review to Appellant's second appellate issue.[11] *See Nobles, supra*; *Snyder, supra*.

_____

[11] Based on our conclusion that the court properly denied Appellant's motion to dismiss because the Commonwealth's actions did not amount to intentional

*(Footnote Continued Next Page)*

- 19 -

Our standard and scope of review in this case are as follows:

> An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*[.] To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings[.]
>
> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

***Commonwealth v. Graham***, 109 A.3d 733, 736 (Pa.Super. 2015), *appeal denied*, 633 Pa. 775, 126 A.3d 1282 (2015) (quoting ***Commonwealth v. Kearns***, 70 A.3d 881, 884 (Pa.Super. 2013), *appeal denied*, 624 Pa. 663, 84 A.3d 1063 (2014)).

In his second issue on appeal,[12] Appellant argues that the Commonwealth's conduct in this case was both intentional and reckless.

---

or reckless conduct, Appellant's first and third issues would not have entitled him to relief even if he properly preserved them.

[12] We note that Appellant's argument section in his principal brief does not directly track each question to be argued and seems to overlap the arguments for each issue raised in the statement of questions presented, in violation of Pa.R.A.P. 2119. **See** Pa.R.A.P. 2119(a) (providing that argument section shall be divided into as many parts as there are questions to be argued). We discern Appellant's arguments related to the Commonwealth's alleged intentional and/or reckless conduct from both Appellant's principal brief and his reply brief.

Specifically, Appellant contends that the Commonwealth operated under a policy of "if you don't ask, you don't get" concerning what information to disclose. (Appellant's Brief at 14). Appellant claims that the only information regarding Detective Nordo's improper conduct that was available in the public domain at the time of Appellant's 2018 trial was from newspaper articles.[13] Appellant acknowledges that there were transcripts in *Powell*, wherein the charges against a defendant were dismissed based on Detective Nordo's improper conduct, but Appellant insists that those transcripts were not widely disseminated and there was no evidence that Appellant's counsel knew of the events in that case. Appellant emphasizes that the *Powell* case was completely separate from Appellant's case, and it was only one of many cases still being tried well after Detective Nordo had been terminated from the police force. Appellant maintains that the depth and breadth of Detective Nordo's misconduct was unknown to trial counsel despite any newspaper articles or the *Powell* transcripts evidencing Detective Nordo's improper conduct. Appellant stresses that the Commonwealth abdicated its responsibility to turn over *Brady* material that was not in the public domain. Appellant suggests

---

[13] Appellant states that the newspaper articles were published on April 13, 2017 and August 23, 2017 referencing Detective Nordo's termination by the Police Department. Another article, published July 3, 2018, discussed the *Powell* case. Appellant claims that the articles addressed Detective Nordo's improper contacts with witnesses and placing money into the inmate accounts of a Commonwealth witness. Appellant claims "[t]his was a far cry from the coercing of statements and manipulation of evidence that underlay [Appellant's] convictions." (*Id.* at 26-27).

the Commonwealth had compiled a "Nordo packet" containing evidence of all of Detective Nordo's improper conduct in various cases, which it failed to disclose to Appellant prior to his 2018 trial.[14]

Appellant further submits that the Commonwealth misled the court and defense counsel prior to trial when it filed its motion *in limine* seeking to

_____

[14] Appellant states: "The court found that the conduct was both reckless and intentional based on the email exchanges between ADA Krouse, Deputy Chief Cameron and Chief Voci in instructing Krouse 'not to call Nordo and to only turn over Nordo materials if requested by the defense.'" (***Id.*** at 19) (citing Trial Court Opinion at 8).

This is a misrepresentation of the trial court's opinion without proper context for the court's statement. The trial court opinion reproduces an email from then-Assistant Chief Cameron to the Homicide Unit ADAs informing the unit that the charges in ***Powell*** had been dismissed due to Detective Nordo's misconduct. The details of the email discuss how Detective Nordo put money on prison accounts of prisoners, gave his cell phone number to some prisoners, and indicated to two prison witnesses that he would go to their backtime judges and try to help them out. The court goes on to state:

> In August of 2018, trial ADA Matthew Krouse emailed his superiors to inquire about whether Nordo could be called as a witness in the instant matter and whether he needed to turn over any information regarding Nordo to the defense. Cameron and ADA Anthony Voci—Deputy Chief of the Homicide Unit at the time—instructed ADA Krouse not to call Nordo and to only turn over Nordo materials if requested by the defense. This email would be evidence of a reckless or intentional ***Brady*** violation if the information to which Cameron referred was not already out in the public domain—but it was. The information known about Nordo detailed by Cameron in the email was readily available to [Appellant] through the notes of testimony from the ***Powell*** case as well as an April 2018 Philadelphia Inquirer Article.

(Trial Court Opinion at 8).

preclude reference to Detective Nordo's termination from the police force based on improper conduct. Appellant claims the Commonwealth was aware of more information than it had disclosed at the time of the motion *in limine* concerning Detective Nordo's actions. Appellant contends that the motion *in limine* "essentially discussed improper contact with witnesses and putting money in inmate accounts, [but] the **Powell** case revealed so much more; specifically, [Detective] Nordo had fabricated and manipulated evidence, and his investigative techniques were suspect." (**Id.** at 30).[15] Appellant contends that "[i]t is one thing where the defense does not do its homework, but it is quite another when the Commonwealth recklessly or intentionally misleads." (**Id.** at 32). Based on Detective Nordo's actions in **Powell**, Appellant emphasizes that Detective Nordo had elicited the statements of Troy Devlin, Jeffrey Jones, and Rafael Spearman, in Appellant's case under "questionable circumstances resembling the tactics used in **Powell**." (**Id.** at 33). Appellant insists that the Commonwealth "saw its case potentially unraveling if this

_____

[15] Appellant insists the Commonwealth failed to disclose the following facts to Appellant prior to trial: (1) Detective Nordo's misconduct in other cases included coercing witnesses and making improper promises to them for the purpose of obtaining statements; (2) Detective Nordo had unauthorized visits to incarcerated Commonwealth witnesses and deposited monies into their prison accounts; (3) Detective Nordo lied about whether he had prior relationships with various witnesses, and one was heard on a recorded prison call telling Detective Nordo that he loved him; this witness referred to him as "Coach"; (4) Detective Nordo took statements from an individual who was under the influence of narcotics at the time and suggested to the witness what was said in the statement; and (5) Detective Nordo kept Powell's codefendant in custody for 17 hours before putting his statement in writing. (**Id.** at 31).

***Brady*** material was disclosed…[and] it chose to purposefully and intentionally hide this evidence." (Appellant's Reply Brief at 21). Appellant avers that the only reason he did not oppose the Commonwealth's motion *in limine* was because the Commonwealth only represented Detective Nordo's financial misappropriation allegations, which was not relevant to Appellant's case; had Appellant known about Detective Nordo's fabrication of evidence and coercing of statements, Appellant would have "delved" into these allegations and sought more discovery. (***Id.*** at 17). Appellant concludes the Commonwealth's actions in this case were intentional and/or reckless violations of ***Brady*** compelling dismissal of this case. We disagree.

This Court has explained:

> The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of denying him a fair trial. However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct.

***Commonwealth v. Wilson***, 147 A.3d 7, 13 (Pa.Super. 2016) (internal citations omitted). ***See also Commonwealth v. Smith***, 532 Pa. 177, 186, 615 A.2d 321, 325 (1992) (holding double jeopardy clause of Pennsylvania Constitution prohibits retrial of defendant not only when prosecutorial misconduct is intended to provoke defendant into moving for mistrial, but also when conduct of prosecutor is intentionally undertaken to prejudice defendant

to point of denial of fair trial).  ***Compare Kearns, supra*** (holding prosecutor's **gross negligence** in failing to obtain and produce defendant's post-arrest written statement to police and statement of principal eyewitness was insufficient basis upon which to bar retrial on double jeopardy grounds; appropriate remedy in such circumstances is new trial).  Further, even where a prosecutor suppresses evidence in violation of ***Brady***, but it is not conscious of its relevance until after trial, such conduct "merits relief…in the form of a new trial, but not the application of the double jeopardy bar precluding the retrial of this case."  ***Commonwealth v. King***, 271 A.3d 437, 449-50 (Pa.Super. 2021).

In ***Commonwealth v. Johnson***, 659 Pa. 277, 231 A.3d 807 (2020), our Supreme Court considered whether the double jeopardy clause bars retrial "where the Commonwealth obtains a conviction based on false evidence and its misconduct, while not undertaken with the intent to deny the defendant a fair trial, nevertheless stems from prosecutorial errors that rise substantially above ordinary negligence."  ***Johnson, supra*** at 283, 231 A.3d at 810.  The relevant facts of ***Johnson*** are as follows.  During investigation of the victim's death, police recovered a red baseball cap located in the middle of the street approximately nine feet from the victim's body.  The cap was assigned a property receipt number.  Shortly after the murder, the victim's friend Ms. Williams gave a statement to police.  Ms. Williams was with the victim on the night of the murder and described the details of her observations to police.

Ms. Williams also explained that the victim had worn a black baseball cap on the night in question. After the shooting, Ms. Williams picked up the black baseball cap, which had a bullet hole in it, and she gave it to police while giving her statement. The black baseball cap was assigned a separate property receipt number and was submitted to the crime lab for testing. Testing revealed the presence of the victim's blood under the brim of the black cap. Several years later, upon new information connecting the appellant to the crime, police obtained a sample of the appellant's DNA and submitted it for testing along with the red cap. Testing showed the appellant was a contributor to the DNA in the sweatband of the red cap.

The Commonwealth subsequently proceeded with its prosecution of the case as if there was only one baseball cap—the red one—which the Commonwealth argued contained both the victim's blood and the appellant's DNA. Nevertheless, the Commonwealth's argument was factually inaccurate, as neither cap had DNA from both individuals.

At trial, the Commonwealth's crucial piece of physical evidence was the red baseball cap, and the prosecutor repeatedly suggested that the appellant had shot the victim at point blank range. Consistent with the Commonwealth's factually inaccurate theory of the case, the lead crime-scene investigator testified at trial that when he recovered the red baseball cap from the scene, he saw fresh blood underneath the brim of the cap. The Commonwealth's forensic scientist also testified that the victim's blood and the appellant's DNA

were both found on "the hat." In closing argument, the prosecutor again told the jury that the DNA evidence showed the appellant's sweat on the sweatband of the red cap, as well as the victim's blood on the brim.

In PCRA proceedings, the appellant learned the two caps, a red one and a black one, had been analyzed in connection with the Commonwealth's case, and that the victim's blood was found only on the black one. The Commonwealth thereafter agreed that the appellant was entitled to a new trial. The appellant subsequently filed a motion to dismiss based on double jeopardy grounds. The appellant learned during discovery related to the motion to dismiss, that the Commonwealth had "misunderstood its own evidence and conflated the findings related to the red and black caps." *Id.* at 288, 231 A.3d at 813-14. Notwithstanding the "unimaginable mistakes by experienced police officers and an experienced prosecutor" made in the case, the trial court found no intentional misconduct or bad faith on the Commonwealth's part and denied the appellant's motion to dismiss. *Id.* at 292, 231 A.3d at 815-16. This Court affirmed the trial court's ruling.

On appeal to the Supreme Court, the Court initially decided that the record supported the trial court's credibility determinations in favor of the Commonwealth. The Court stated that the trial court had personally heard extensive testimony from numerous witnesses involved in the prosecution, actively questioned many of the witnesses, and ultimately credited the prosecutor's testimony and found the Commonwealth had not acted with the

intent to deprive the appellant of a fair trial. *Id.* at 297, 231 A.3d at 818-19.

Regarding the scope of double jeopardy protections, the Supreme Court held that "prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result." *Id.* at 309, 231 A.3d at 826. In so holding, the Court clarified that it did not "suggest that all situations involving serious prosecutorial error implicate double jeopardy[.]" *Id.* Rather, "retrial is only precluded where there is prosecutorial **overreaching**—which, in turn, implies some sort of conscious act or omission." *Id.* (emphasis in original).

Applying its holding to the facts of the case at hand, the Court emphasized the trial court's findings that the prosecutor had made "almost unimaginable" mistakes, which "dovetailed" with other serious errors by law-enforcement officers and other police personnel such as the DNA lab technician. *Id.* Recounting the errors in the case, the Court highlighted: (1) the prosecutor's failure to notice that there were two property receipt numbers for the two caps, and his failure to verify whether the receipt numbers pertained to different caps; (2) the prosecutor's failure to obtain a criminalistics report which would have summarized the evidence and revealed that there were two different caps involved; (3) the failure of the detective who had interviewed Ms. Williams on the night of the shooting to recall the

evidence of the black baseball cap and Ms. Williams' statement that the victim had worn the black cap on the night of the murder; (4) the false testimony from the lead crime scene investigator at trial that he saw fresh drops of blood under the brim of the red cap on the night of the murder, which was factually inaccurate. On this point, the Court stated it could not "escape the conclusion that the officer testified to something that he did not actually observe[.]" *Id.* at 311, 231 A.3d at 827. Thus, the Supreme Court held that the Commonwealth's actions were "strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial." *Id.* Such actions prejudiced the appellant to the point of a denial of a fair trial, immunizing the appellant from retrial for the murder of the victim. *See also Commonwealth v. Sanchez*, 262 A.3d 1283 (Pa.Super. 2021), *appeal denied*, ___ Pa. ___, 278 A.3d 853 (2022) (affirming order denying motion to dismiss on double jeopardy grounds where Commonwealth failed to disclose DNA evidence from fingernail clippings of victim to defense before or during trial; Commonwealth's actions were not intentional misconduct and actions did not rise to level of type of recklessness in *Johnson*).

Instantly, the trial court explained its denial of relief as follows:

> [T]o the extent that a *Brady* violation was assented to by the Homicide calendar judge, the violation certainly did not amount to an intentional or reckless suppression of evidence, warranting a dismissal. [Appellant] points to a series of internal emails exchanged amongst ADA Matthew Krouse and the Chief and Assistant Chief of the Philadelphia

District Attorney's Homicide Unit in the summer of 2018, prior to [Appellant's] trial, in support of his claim of a reckless or intentional *Brady* violation. On June 6, 2018, then-[District Attorney's Office] Homicide Chief Edward Cameron sent an email to the Homicide Unit ADAs informing the unit that the case of *Commonwealth v. Darnell Powell* had been dismissed due to Nordo's misconduct. In that email, Mr. Cameron details what is known to the office at that time. Cameron wrote:

> "The only thing we know is that Nordo put money on the prison accounts of the prisoners listed in the above attachments. He also gave his cell number to some prisoners and talked to them in recorded prison calls. In *Powell*, he indicated to the two prison witnesses that he would go to their backtime Judges and would try and help them out."

In August of 2018, trial ADA Matthew Krouse emailed his superiors to inquire about whether Nordo could be called as [a] witness in the instant matter and whether he needed to turn over any information regarding Nordo to the defense. Cameron and ADA Anthony Voci—Deputy Chief of the Homicide Unit at the time—instructed ADA Krouse not to call Nordo and to only turn over Nordo materials if requested by the defense. This email would be evidence of a reckless or intentional *Brady* violation if the information to which Cameron referred was not already out in the public domain—but it was.[16] The information known about Nordo detailed by Cameron in the email was readily available to [Appellant] through the notes of testimony from the *Powell* case as well as an April 2018 Philadelphia Inquirer Article.

Although this court does not find a *Brady* violation, [Appellant] is entitled to a new trial based on after discovered evidence due to the information uncovered by the investigating grand jury and the recent conviction of

---

[16] *See Commonwealth v. Roney*, 622 Pa. 1, 79 A.3d 595 (2013), *cert. denied*, 574 U.S. 829, 135 S.Ct. 56, 190 L.Ed.2d 56 (2014) (explaining that *Brady* is not violated when appellant knew, or with reasonable diligence could have uncovered, evidence in question, or when evidence was available to defense from other sources).

Nordo. …

\* \* \*

Here, the additional evidence of former-detective Nordo's misconduct as well as his conviction qualifies as after-discovered evidence. Although the defense did not present the testimony of the trial witnesses at the [evidentiary] hearing, a review of the trial record reveals that witnesses recanted their testimony at trial stating that Nordo, who was involved in their interview, either promised them something or threatened them with prosecution. Such evidence, along with Nordo's conviction is not merely corroborative or cumulative; would not be used solely to impeach the credibility of a witness and would likely result in a different verdict if a new trial were granted. However, this court does not find that retrial is barred due to an intentional or reckless **Brady** violation.

(Trial Court Opinion, filed 6/10/22, at 7-9).

Initially, we see no reason to disrupt the court's implicit determination that the testimony from each witness at the February 15, 2022 and March 4, 2022 hearings was credible. **See Graham, supra**. **See also Johnson, supra** at 296, 231 A.3d at 818 (discussing great deference afforded to trial courts regarding credibility determinations). The collective testimony from the witnesses at the hearings demonstrate that at the time of Appellant's 2018 trial, the Commonwealth was aware: (1) there was a 2005 sexual incident involving Detective Nordo; (2) charges against a defendant had been dismissed in the **Powell** case due to Detective Nordo's misconduct in the nature of putting money on inmate's books and promising to help with witnesses' backtime; and (3) there was an ongoing grand jury investigation surrounding Detective Nordo's misconduct. Regarding the 2005 sexual

incident, although the Commonwealth did not disclose this evidence to defense counsel prior to Appellant's 2013 or 2018 trials, we agree with the trial court that it would have been completely irrelevant to the facts at issue in Appellant's case. Regarding the allegations against Detective Nordo in *Powell*, the transcripts were in the public domain and defense counsel could have ascertained that information and moved for further discovery if defense counsel had believed the allegations in *Powell* were consistent with witness recantations in Appellant's first 2013 trial. Concerning the grand jury investigation, the investigation was kept secret and the Commonwealth attorneys involved in this case were not privy to those details.

Even if there was a *Brady* violation committed in this case, we agree with the trial court that any *Brady* violation was not intentionally undertaken to prejudice defendant to point of denial of fair trial. *See Smith, supra*. We further agree with the trial court that the Commonwealth's actions here did not amount to the type of "prosecutorial overreaching" whereby the Commonwealth acted "with a conscious disregard for a substantial risk" of depriving Appellant of a fair trial. *Johnson, supra* at 309, 231 A.3d at 826. Rather, the record makes clear that at the time of Appellant's September 2018 trial, the Commonwealth was not yet aware of the breadth or depth of Detective Nordo's misconduct, the details of which were still unfolding at that time. It was not until Detective Nordo's 2019 indictment that the Commonwealth learned of Detective Nordo's coercive interrogation tactics,

which might have affected the witness statements against Appellant in this case. Under these facts, the remedy due to Appellant is precisely what the court ordered here and what the Commonwealth agreed to—a new trial. ***See Kearns, supra***. Based upon the foregoing, we affirm the order denying Appellant's motion to dismiss the charges against him based on double jeopardy grounds.

     Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/11/2023</u>